Our second case this morning is Mittelstadt v. Perdue. Mr. Jablonski. Good morning. Thank you for your support. Closing counsel, Mr. Mittelstadt, if I could just... The State Bar makes us tie up our computers with all of these passwords, so I can't open mine. But I'm going to start anyway. This case is about the Conservation Reserve Program and a contract that was issued under the Conservation Reserve Program. Conservation Reserve Program, as I'm sure you understand, is a program through which people set aside property and they accept restrictions on their use of the property in order to promote environmental ecological values. There are two bodies of law that govern those contracts in that program. The rules are located at 7 CFR Part 1410. They're extensive. In addition to the rules, there is a handbook. The handbook is also very extensive. The version I looked at was 898 pages with 42 pages of exhibits setting forth procedures. And it needs to be that way so that everyone who participates in the program is treated the same. We have two claims that we've brought here and they're both related to Mr. Mittelstadt's attempt to secure a second contract starting in 2006 under the CRP Program. He had a preexisting contract, Contract 653, which started in 1997. You get them in 1996, they start in 1997. The controversy here arose out of his effort to secure another contract. What happened was, through the procedure that is established in the handbook and specified in the rules, Mr. Mittelstadt was deemed was eligible to apply for, to compete for, another contract in the next contract in the 2007 to 2017 time frame. What was determined after that contract had already been approved by the subdivision of the agency that approves contracts, after the property had been inspected, after Mr. Mittelstadt had been issued a conservation plan that goes along with the contract, after he had signed the contract, after the contract had been signed for FSA, following all of that, the local office in Richland County started a new procedure which is provided for nowhere in the regulations and nowhere in the handbook. This case has been under litigation for a long time. Mr. Mittelstadt has taken it through five levels of administrative consideration. It was stipulated at NAD, the National Appeals Division of the FSA, that there was a single issue. That single issue was whether Tract 9073, Mr. Mittelstadt's tract, was eligible to compete for a contract in 2007. That eligibility turned on, under the rules, it was under 1410, this is all 7 CFR, part 1410.6A3, eligibility is defined, they identify what kinds of properties are eligible. A3 defines eligibility as a property that already has an existing contract. At the time that Mr. Mittelstadt sought the new contract, he already had an existing contract, Contract 653, which had been won in 1996 and which started its term in 1997. But how important is it to your argument that we agree with you that Mr. Mittelstadt had a binding contract or had a contract? Can you prevail if we conclude you're either wrong on that or we don't have to resolve it? Well, the determination that was made by the agency was that he did have a binding contract. So you'd be overruling FSA. Well, hold on, hold on. Okay. What we're reviewing, right, this court, under the APA, the Arbitrary and Capricious Standard, the 7062A standard, I can ask it in the form of a question. Aren't we reviewing the determination of the director and by incorporation the deputy director of the USDA? Yes. Because everything that preceded that at the county level, at the state level, et cetera, it all rolled up ultimately into that decision. You're exactly correct. Okay. And so if that's what we're reviewing, how important is it to your position that we agree with you on the contract argument? Or is it not important? Well, the deputy director found that Mr. Middlestadt agreed with two things. Number one, that the sole issue stipulated for consideration at the NAB level of determination was whether Mr. Middlestadt's contract he was eligible to apply for in 2007. Eligibility to compete for the contract in the 2006 to 2007 timeframe, by the rule, depends on whether Mr. Middlestadt already had a contract. And this was stipulated also as the issue in this case. He won on that. He won on the old period. He won on that. And that should have been where it ended because that was the only stipulated issue that was presented to NAB. Let me ask the same question in a different way. Suppose we have an agency. Get away from these facts. Hypothetically, that program participants have signed contracts, just like Mr. Middlestadt did. Some other people did as well. But the agency determines, for one reason or another, say Congress hasn't funded the program, that they're no longer going to allow the individuals that signed the contract to participate in the program on a going forward basis. Is that arbitrary and capricious action by the agency? Once the decision has already been made under the agency's own procedures, yes it is. The determination as to whether Mr. Middlestadt was, okay, there was the eligibility issue. But you have the director here saying, and the deputy director, that the terms of the program changed. They didn't. Well, I mean, so is it a false statement? Yes. By the head of the agency? It is an incorrect statement, Your Honor. The statement is turned on the issue of whether there existed a definition of mixed hardwoods. And so what they said, the initial controversy, as it was characterized by the local county, was that Mr. Middlestadt had failed to meet a definition of mixed hardwoods that applied in 1996. Okay? So therefore, from 1996, he wasn't really, shouldn't have really had that contract. And because he shouldn't have really had that contract, that positions us to say. You have to stay in front of the microphone for the recording device to pick you up. That positions us to say that you are not entitled to this next one because you lost your eligibility. So you cancel out the old one by saying that he didn't meet the mixed hardwood standard. That takes away his eligibility to have competed for the new one. So then the new one goes away, too. Now, the issue of the mixed hardwood standard didn't exist. The new one going away is the only issue in front of us, though. Pardon me? The new one going away, as we're putting it, is the only issue in front of this Court. Yes. Because he won. It took him, to be sure, it took him to the director level or the deputy director level to prevail on the prior period. But he did. And they stipulated that if he won on that issue, which depended on eligibility, that was the only issue. This controversy was about the contract that was worked on, developed in 2006 for the 2007 timeframe. The dispositive issue that was stipulated was whether he was eligible to have competed for that. The reason that that was the dispositive issue is because the agency has a precisely defined method for how you compete for those contracts. And he had gone through that. It is not up to the local county to decide to undo a contract. The determination as to whether you secure a contract comes through a procedure and is made by the Conservation and Environmental Programs Division, not by the locality. What that division does, and it's in the flow chart, which is at pages 111 to 112 of our Appendix B, what CEP does is they make the determination as to whether a contract application is acceptable or rejected. Once they make that determination, then it goes to the county, and the county is given ministerial duties. They've had their opportunity for input in the contract development process, but once the contract is determined to be awarded by CEPD, the locality is given specific duties. They are told specifically that you need to sign this contract, you need to issue the conservation plan. This is the process. He had gone through the specified process defined by the agency to win the second contract. The determination as to whether he was entitled to that second contract had been made by the only entity within FSA that is empowered to make that decision, and it's done through a competitive process. The county had lots of opportunity, and they actually had an affirmative obligation to tell him if his contract application was not what it was supposed to be. They were required to tell him what he needed to do in order to increase his EBI, the environmental benefits score. The way that these contracts are awarded nationally is that CEPD gets all of these contracts on a schedule from all around the country, and they're scored on an environmental benefits index score. That's price, it's a number of factors that are laid out in the handbook. In the process, because he was eligible, and in the process of applying, they were required, they were affirmatively required to tell him if there was anything that he could do to increase his EBI score. Where does that obligation come from? It comes from the handbook. It's not in the regulations or the statutes that govern this program? It's in the agency's own handbook. And what part of the handbook imposes that requirement? It's Exhibit 19 to Paragraph 170, and it's our Appellants Appendix B. It's at page 138. Thank you. It's right there in chapter and verse. FSA shall review the fact sheet. They are actually required, the producers, people who are applying are actually required to certify that they have had this consultation about the EBI score. FSA will review EBI scoring parameters with producers and encourage the planting of cover types and conservation measures, if appropriate, that will provide higher environmental benefits. I'm at 236, and I wanted to save three minutes. That's fine. Okay. Mr. Humphrey. May it please the Court, good morning. I'm Assistant United States Attorney Richard Humphrey, and I represent the defendant appellee in this case, that being the Secretary of the United States Department of Agriculture, and I represented the defendant before the District Court in this case. This is basically an appeal from the District Court's judgment affirming a final decision of the Secretary. It's brought under the Administrative Procedure Act. The final decision that we're looking at, as the Court already noted, is really the decision of the Deputy Director of the National Appeals Division, and that the Director denied reconsideration, therefore the Deputy Director's decision became the final decision. That was the decision made in 2009. I think Mr. Jablonski's position, as I understand it, is in, if you look at the blue brief in the appendix, page 35. Okay, you have it there? As I understand this, and the reason I'm asking this question is I want to make sure that we're, we try to get on the same page as to what the dispute is. I think the point he's making is that the Deputy Director's statement that FSA may change the standards for eligibility, for re-enrollment, et cetera, et cetera, and that's what happened here. And Mr. Middlestad, in the Deputy Director's reasoning here, just does not comply with the program requirements on a going-forward basis. I think your adversary's point is that just fell out of the sky. That's made up, because everything that preceded that, everything he was just walking us through, was completely at odds with that. So can you just react to that? Yes, okay, the standard was that by 2006, the standard that Farm Service Agency, on behalf of Commodity Credit Corporation, was looking for was that there be mixed hardwoods, that is two species of hardwoods mixed together in the field. And the way they interpreted that was that there had to be hardwoods, a mixture of both kinds, planted in the same rows, or another way of saying it was scattered throughout the field. That's what they were looking for in 2006 at the time when this re-enrollment came up. Okay, and is that written down anywhere? No, it is not. How would Mr. Middlestad know that? Well, he wouldn't maybe necessarily have known. But first of all, there was no requirement that it be written down. There was no requirement that they give him notice. He was in a 10-year contract under Contract 653 that began back in 1997, and he got everything he bargained for under that contract. Okay, I think there isn't a concern that on a going forward basis, he believed he was entitled to re-enrollment, to continued participation, but he had no idea under what standards. And so isn't his concern really at bottom when you sort through all this about standardless agency decision-making? Well, I think that's his problem here is that he thinks that he had no way of knowing. But the fact is, first of all, I don't think his property, I don't think that Contract 653 ever should have been reinstated because of all the failed trees that were on the property. But it was. Okay. But as for Contract 1710, he didn't meet the standard. There's no equal protection argument here that he was treated any differently than any other persons who were trying to enroll their property into the program. That's never been brought up. And also, I've cited CASAW in my brief, that the agency has the right to change its definitions. And I think what this really was was really they were to the point where they were more strictly enforcing their interpretation of mixed hardwoods. I mean, there's no question that for an EBI score of 50 points, he had to have a mixed stand, that is, two species of hardwoods on his field. And he didn't have that. I mean, first of all, a lot of the oak trees had failed. A lot of the walnuts had failed. In fact, there were some areas that only had like 10% of the trees still growing. There was one area on the 65 acres where there were just pine trees, which is a softwood. And there was nothing wrong with having pine trees mixed in with the hardwoods because they were planted as trainer trees. So that was acceptable. But nevertheless, there was one area where there were no hardwoods. There was even an area, I believe it was about 4 1⁄2 acres, that had no hardwoods at all on it. And so he didn't meet the standard, and he wasn't treated any differently than anybody else that was enrolling to get into the program. And when you think about the definition of mixed hardwoods, it really sounds like, okay, mixed. In other words, the two species have to be mixed on the property. His were planted in separate stands. He had a stand of redwoods. I'm sorry, a stand of red oaks. And then there was a stand of the black walnuts. But as I say, so many of the trees had failed, and he admitted that they had failed, that his property simply didn't meet the requirements for what they were looking for for properties in the CRP in 2006. So your view is that the secretary has absolute discretion? Yes, and in fact... Is there any statute or regulation that specifically gives him absolute discretion in how he defines the most advantageous property to receive these grants? Yes, Your Honor. As far as the discretion, if you look at 7 CFR 1410.31, subdivision A, it specifically says that Commodity Credit Corporation has sole discretion to accept or reject any offer and may reject them for any reason that will accomplish the goals of the CRP. So right there is the discretion. It was totally broad. I don't know of any cases that even interpret the secretary's discretion under section 1410.31A. And so I'm not even sure that the court has the authority to say that it went beyond its discretion or abused its discretion because, you know, for that matter, there is no standard in the case law for what this kind of broad discretion, you know, that there's any limit on it. That's as far as it gets. That CFR section, that's all you really have. Well, that's where the discretion came from, yes. And the other fact is that even if the property were enrolled, the contract could have been terminated because it didn't qualify. It didn't have the mixed hardwoods on it that were mixed into the same rows and scattered throughout the field, and so many of the trees had failed anyway. And I might note, too, that there's nothing that Mr. Middlestack could have done about it. It's not as if he could have planted more trees and somehow come up to the standard that the agency was looking for at that time. And the reason I say that is that he admitted before the State Committee that it wouldn't do any good to plant new trees. Is there anything in the statute or its legislative history as to why Congress gave the Secretary such broad discretion? Not that I'm aware of. I'm not sure why the Secretary was given such broad discretion, but nevertheless, it's right there in the regulations. And what the dispute is really about is this understanding of what it means to have mixed hardwoods, which is one of the many inputs into the Employee Benefits Index, which is the score that determines your... I think that was the main basis for the final decision of the agency in this case, was that the property did not have mixed hardwoods. Does the EBI, the Environmental Benefits Index, does that have a statutory basis or a regulatory basis, or are those just criteria in this handbook that looms so large? Well, it's definitely in the handbook. I'm not sure if it's in the regulations or not. But it's definitely in the handbook. The different numbers of points are assigned for different types of properties. And who promulgates that? I think that would have been the Secretary ultimately. It would have been the agency. When you say it is in the handbook, if we all got the handbook out today and put it on that table, would the definition of mixed hardwoods or what I have to do as a landowner to satisfy that standard be clear to everyone in the courtroom? Not from 2006. It wouldn't because it wasn't defined. There was no written definition of mixed hardwoods at that time. So it's an odd program, isn't it? I mean, you're talking about planning things on land, that landowners that want to apply to participate in a federal program have no idea what they should do with respect to tree planning to comply. Well, they could have gone to the agency and asked at any time, it seems to me like, if there was some question. And what quality an answer would they have gotten if there wasn't a definition? I can't speculate on that. So that would have been a fruitless inquiry? Well, I mean, hopefully they would have said that you need to have hardwoods planted. But the thing that troubles me about that is that if Judge Sykes got a different answer than Judge Ripple got with respect to their property, and I was getting the runaround on mine because I'm a squeaky wheel at the town council or what have you, I mean, if this definition is not in any, embodied anywhere, I mean, how is a landowner to know whether their decision to deny re-enrollment was not arbitrary and capricious? Well, I'm sure there are all kinds of terms and phrases that are used throughout the handbook that aren't defined. And so the fact that this wasn't, I mean, the plaintiff has never pointed to any requirement that there be a written definition of mixed hardwoods. The secretary issued no kind of notice or anything saying he was now going to be accepting new applications for contracts under the program and that these were his definitions, this is what he was looking for in terms of... Not as far as a definition of mixed hardwoods, no. Mr. Middlestadt was notified that he could re-enroll or file an application to re-enroll into the program, which he did, he filed the application. But there never was a contract, and I do want to make that point clear that the agency, when that contract was sent in in August of 2006, although the county executive director had signed it at first, he then whited out his signature and so it never really became a binding contract. And the contract form was never delivered to Mr. Middlestadt. And so... How do we know his neighbor wasn't told something different? Well, there's no evidence that anybody else was told anything. Well, the other way around, either. Right? The regulations 141032, when they talk about the contract, say that it needs to be signed by the producer and the owners of the cropland, period. It says not a thing about needing to be countersigned. Well, the handbook requires that the county executive director... Well, it might, but wouldn't the regulations trump the handbook? Well, but for a contract, I mean, if you look at the contract form, and there's a copy of it in Appendix B, it's labeled right at the top, Form CRP-1, Conservation Reserve Program Contract, and there are signature lines on there for both the producer and a representative of Commodity Credit Corporation. So I think until that particular form was signed, there was no contract, and I'm looking at Appellant's Appendix B, page 90. There's a copy of the proposed contract there, and as I say, there is a signature line for the county executive director, which you would expect a contract like this that's going to run for a 10-year period be with a government agency that, of course, both the applicant and somebody from the government would need to sign that before it would become an actual contract, and there would have to be delivery because under both state and federal law, a contract has to be delivered in order to become a binding contract, and here there was no delivery. Does the court have any other questions, or is there anything else that I could address? Apparently not. Thank you. Thank you. Mr. Jablonski. Thank you. The only definition of mixed hardwoods that existed with respect to this property was the definition that was in the associated conservation plan. During the time, during the period of 2007, when Mr. Middlestadt was applying for the new contract, there was a specific procedure. There had to be an inspection associated with that procedure. He paid for that inspection. That inspection was done on May 6th of 2006. It said, trees looking good. It was a good inspection, and they actually, the local county, has to identify, while he's in the process of applying for the next contract, if there are any changes that need to be made to the conservation plan. And this is in what document? All of this information is in what document? The conservation plan? Yeah. Okay. The obligation to tell him about the... It's all in the briefs. So the conservation plan... Where are we going to find this? Okay. He can't violate the conservation plan, so he couldn't have changed his property. The conservation plan... I'm sorry, I forgot your question. Where am I going to find this? These are all identified in the briefs with references to the appendices, and the references to the appendices are attached, and they include some key portions of the CRP handbook. I would like to say just one thing about the regulation, and my 40 seconds left. This regulation that was identified, 1410.31, 7 CFR 1410.31, that's the one that indicates that people may submit offers. You then go to 1410.2b. An offer is a per acre rental payment. That's what an offer is. That is what Mr. Middlestadt was assembling and putting together when his property was inspected, and when the county was sending the information about how he qualified under the EBI index. The deputy director identified... A red light. Do you have a concluding thought? I do. Okay. The deputy director, in his decision, identified his task as determining compliance with rules. The rules are the portion 1410, 7 CFR 1410, and he said, I have to look to the handbook and the rules. That's in Appendix A, which is attached to our initial brief on Appendix page 34. The procedure through which this contract was unwound had no basis. The local committee, the FSA, can, yes, they can say, we're going to issue this contract instead of that contract. However, they issue those contracts because this stuff is coming in from all around the country through a procedure. He had already won 1710, the new contract through that procedure. If he had not already won the new contract through that procedure, 1710, that number would not exist. That's the number that's associated because he won that contract through the CEPD awarded it. The procedure was so... There is no definition of mixed hardwoods with the exception of associated with particular conservation plans. His property repeatedly met the definition of hardwoods mixed or mixed hardwoods. It's in the conservation plans. All right. Thank you, counsel. The case is taken under advisement, and our thanks to both counsel. Thank you.